**UNITED STATES of America,**
**Appellant,**

**v.**

**NATIONAL WHOLESALERS, a corporation; M-D Parts Manufacturing Company, National Parts Company and Henry Mezori, Appellees.**

**No. 14692.**

United States Court of Appeals
Ninth Circuit.

Sept. 18, 1956.

Warren E. Burger, Asst. Atty. Gen., Alan S. Rosenthal, Melvin Richter, Paul A. Sweeney, George S. Leonard, Attys., Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., for appellant.

William H. Neblett, Los Angeles, Cal., for appellee.

Before FEE and CHAMBERS, Circuit Judges, and FOLEY, District Judge.

CHAMBERS, Circuit Judge.

National Wholesalers, a California corporation, was low bidder in the year 1950 to supply the Department of the Army with 6,600 generator regulators for motor vehicles at $23.50 each. The call for bids had specified catalogue items DR (for Delco-Remy) 1118502, GM (for General Motors) 1118502, or IHC (for International Harvester Corporation) 50301–R1 "or equal." The bid call also made reference to Army ordnance stock numbers for the item.

By the terms of the bid call which had been previously mailed to 56 prospective

bidders, it was required that if "or equal" was offered by the bidder he should so state. Not mentioning "or equal," National Wholesalers said on its bid that it was "bidding" DR–1118502 regulators. Thereupon, the proper Army contracting officer in behalf of the United States entered into a contract incorporating within it the bid. In our judgment, properly construed, the contract required the bidder to furnish the proprietary Delco-Remy regulator and nothing else.

It seems that in the background of National Wholesalers' plan to obtain the contract was its belief that it could obtain a supply of Delco-Remy regulators perhaps sold by the government as World War II surplus. It would now sell them back to the government. But due to changes in specifications [1] on the Delco-Remy regulators, the old surplus model would not meet current specifications. Caught in this dilemma, National Wholesalers decided that it would manufacture regulators substantially meeting the specifications of the Delco-Remy model. What it made is described in the record as a "Chinese copy." The government now has some lingering contentions that the Chinese copies were not as good as the specified Delco-Remy. The trial court found that the substitutions were "equals."

The controversy here principally stems from the fact that surreptitiously National Wholesalers caused spurious Delco-Remy labels [2] to be printed which it attached to its product prior to delivery to the Army. For some months the Army, in ignorance, accepted the regulators as delivered in installments by National Wholesalers in performance of its contract.[3] After 4,086 regulators of the contracted 6,600 had been inspected and received by the Army, the shoddy operation of the contractor was discovered. A "stop order" on receipt of deliveries was issued and off for testing to the Detroit Arsenal went one of the bogus regulators supplied by National Wholesalers along with a sample of the genuine Delco-Remy article. The tests were very favorable to the contractor. The substituted article, as to performance, was found to be within established limits of tolerance variations for "or equal" items.

At this point the Army about faced and its contracting officer advised the contractor by letter that the counterfeit labeled product would be accepted as "or equal." So much of the case turns upon the letter that it is set forth in full as follows: [4]

1. Mainly changes had been made in the regulator which introduced elements to insulate against interference with radios.

2. The mislabelling was not as complete as the customary markings and labels on the genuine Delco-Remy product.

3. Prior to September 14, 1950, National had made shipments in 17 installments, each shipment being represented by an invoice. Contemporaneously with shipment the Ordnance Department made inspections of the regulators. The inspection, by one witness, was described as a "shelf count." That is, the inspector made a casual visual inspection and verified the count. At the direction of ordnance, the regulators were consigned to various army stations or posts. Because of the various destinations, one day's shipments were sometimes represented by more than one invoice. Before September 14, 1950, there were 17 invoices which were attached to a total of ten government vouchers.

4. Prior to the contracting officer's letter of October 16, 1950, National Wholesalers was advised of the test results in a letter as follows:

"Ordnance Department
Detroit Arsenal
Center Line, Michigan
"Key Inspector/HSprengel/vr/287
11 October, 1950.
"In Reply
Refer to ORDMX–1
"National Wholesalers, Incorporated,
1211 South Brannick Street,
Los Angeles 23, California.
"Gentlemen:

"Reference is made to your letter dated 7 October, 1950, and, in compliance with your request, inclosed herewith is a copy of the test results on Voltage Regulator, DR–1118502.

"The test results are self-explanatory and are for your information.

"All Communications Should be Accompanied by Carbon Copy and Addressed to Los Angeles Ordnance District
U.S. Army
35 North Raymond Avenue
Pasadena 1, California

"To Insure Prompt Attention
In Replying Refer to
LAD No. 160–96/5 Nat'l W.
Attention of Legal Br.

16 October, 1950.

"National Wholesalers, Inc.
4395 East Olympic Boulevard,
Los Angeles, California.

"Gentlemen:

Subject: Contract No. DA–20–018–Ord–3951

"Under date of 15 February, 1950, an Invitation for Bids, WD Form 106, was issued by Detroit Ordnance District inviting the submission of bids for furnishing 6,600 each Regulator, generator, Assy., Mfr's Part Nos. DR–1118502, GM–1118502, IHC–50301–R1, or equal. ORD–7069022, ORD–7069023. Ordnance Stock No. 2580–1118502. Vehicle Application SNL G541, G671, G506, F501, G508.

"Under date of 6 March, 1950, you offered to furnish 6,600 each Regulator, generator, Assy., Mfr's Part No. DR–1118502 at a price of $23.-50 each; on 1 April, 1950, your bid was accepted by the Government; and under date of 12 April, 1950, the contract thereby created was transferred to the Los Angeles Ordnance District for administration.

"Subsequently Regulators were submitted to the Resident Ordnance Inspector for inspection and a total quantity of 4,086 Regulators were inspected and accepted by the Government. It then came to the attention of the Contracting Officer that Regulators which had been manufactured locally were being offered for inspection and acceptance, and on 14 September, 1950, the Resident Ordnance Inspector was therefore instructed not to accept such Regulators pending a decision as to whether they were in conformity with the requirements of the contract.

"In this connection your attention is directed to the fact that in your bid you offered to furnish one of the approved items listed in the Invitation, and that on page 1 of Schedule 'A' of your bid you indicated by appropriate underscoring (a) that you were not a manufacturer of the articles quoted on and (b) that you do

"For the Commanding Officer:
/s/ Harold Souder,
Harold Souder,
Assistant
cc: Los Angeles Ord. District.
(Copy)
"Job Order No. 2324–1049.
Ex. Order No. 547–60.
Report No. 517
Date: 5 October, 1950.
"Branch: Electrical.
To: Chief, Inspection Division.
Attn.: R. W. Clark, Facility Inspection.
"A. Purpose:
Comparison and operational breakdown test of two Delco-Remy Regulators, Ord. No. 7069023.
"B. Results:
Delco-Remy Regulator, Model 1118502, Serial No. 138275 and Delco-Remy identical specimen, without serial number varied two-tenths of one volt, and a maximum of two amperes over a range from 1,500 to 4,000 R.P.M.
Visual inspection revealed no difference in construction, materials used, or methods of adjustment.
"C. Conclusion:
The two regulators have similar characteristics and are interchangeable.
Written by:
...................,
H. T. Deskins.
Reviewed by:
...................,
T. S. Bolton,
Chief, Electrical Branch.
Approved by:
...................,
Rex H. White, Jr.,
"Major, Ord. Corps, Chief, Components Laboratories Division."

regularly carry a stock of such articles. This was construed to mean that you regularly carry a stock of genuine Delco-Remy Regulators, and since the Regulators tendered for acceptance bore a Delco-Remy name plate, it was assumed that they were the approved items upon which you bid. Also, the 'Special Conditions' which constitute a part of your bid established a procedure for qualifying 'or equal' items, which had not been followed, thereby entitling the Government to cancel the contract for default pursuant to the provisions of the contract, should it elect to do so.

"The instructions previously furnished the Resident Ordnance Inspector to discontinue acceptance of such items was therefore confirmed and arrangements were made with Detroit Arsenal for the testing of one of the Regulators in order to determine its acceptability as an "or equal.' As a result of the tests conducted by Detroit Arsenal it has been determined that the Regulator tested qualified as an 'or equal' and the Resident Ordnance Inspector is being advised and instructed accordingly.

"Very truly yours,
"/s/ John MacL. Hunt,
"Ordnance Corps, Contracting and Purchasing Officer."

■■ After receiving the letter, National Wholesalers quickly finished the delivery of the remaining 2,514 regulators under the contract and was prompt-

ly paid for these, as it had been on the first 4,086.[5]

It is to be remembered that the American intervention in Korea began on June 27, 1950. There probably was a mobilization urgency in October, 1950, and responsible officers may have thought it more important to get the remaining regulators into their supply, than it was to get into the business of litigation or to pursue those who were guilty of an imposition on the government. They overlooked the fact that one of the finest things for which this country stands is that the American label guarantees contents are the product that the label represents them to be, and that is true whether the label is on Bethlehem's steel or on Mrs. Lerua's tamales. That is one of the many things an American soldier fights for. Ill becomes its officers to traffic with deceptive labels, even if they qualify as "or equals."

In the quieter days of peace, apparently someone in the Army began to reflect on National Wholesalers' imposition. The case found its way to the United States Attorney's office in Los Angeles. On July 3, 1953, he filed a civil complaint against National Wholesalers, against two of its affiliated companies, and against Henry Mezori who controlled all three. It asked under the False Claims Act for $2,000 for each of the 17 false invoices submitted by Mezori's company, or a total of $34,000. The pertinent section (see 31 U.S.C.A. § 231) is as follows:

"Any person not in the military or naval forces of the United States, or in the militia called into or actual-

---

5. The invoices of National Wholesalers sent in as a part of each claim described the units theretofore furnished as:
"Item
No.    Description of Article
1 Item 1(1) Contract—Regulator, generator,
Assy. Mfr's Part Nos. DR-1118502,
GM-1118502, IHC-50301-R1, Ord.-7069022,
ORD-7069023. Ordnance Stock No. 2580-1118502. Vehicle. Application

SNL G541, G671, G506, G501, G508."
Defendants rely heavily on the "ord" (for ordnance) stock numbers, supra, to exculpate themselves. They say the invoice amounted to no more than saying, "We supplied one of the three proprietary numbers, DR, GM or IHC, or the ordnance stock number. Our product qualified under the ordnance stock number." This court is of the opinion that the invoice meant that one of the proprietary articles qualifying under the ordnance stock number had been supplied.

ly employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every

person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, shall forfeit and pay to the United States the sum of $2,-000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

However, the district court ruled in the defendants' favor and made findings accordingly. The trial court thought the contract in its original form permitted the delivery of "or equals." Such a finding is contrary to the express terms of the contract. The court also found the substitutes were "equals" just as the Army had done. Assuming there was no fraud alleged or proved [6] as to the "testing," the courts should accept the Army's fact determination that what was furnished was equal.

Also, the trial judge relied on the disputes clause of the contract which reads as follows:

"Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision or that of his designated representative, representatives or board

6. Fraud was not alleged or proved, although the actual testing seems to have been limited to a visual inspection and an electrical performance test. It is not shown that durability was tested.

shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract."

Said the trial judge, "A dispute arose. The contracting officer decided it. The decision became final when the time for appeal within the Department of the Army went by."

There is some strength in the argument that perhaps the contracting officer when he wrote that the substitute article qualified as "equal" made a determination of fact which is now binding on the government. But on the whole, this court is of the opinion that the letter of October 16, 1950, did not meet the issue and was not such a determination. But if it was a determination, then the law of this circuit is against the defendants. The case of United States v. Lundstrom, 9 Cir., 139 F.2d 792, still seems to be the law here. While it may be somewhat weakened by United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256, yet this National Wholesalers' case is a much weaker one for the application of the rule contended for by the dissent in Lundstrom under Lundstrom's facts. Especially is this true when it cannot be clearly said that the contracting officer actually determined the basic issue of whether National Wholesalers had furnished what it agreed to furnish.

■■ The court found that no claim was false. It is the opinion of this court that every one of the invoices prior to October 1, 1950, was false when made. The test of whether a claim is false must be as of the date when the claim is made. There might be an exception; it might be held that if midway in performance the contracting officer and the supplier modified the contract ab initio on some detail of no great consequence and agreed to accept for the whole performance an "equal" that a court should say that the purpose of the False Claims Act was not to reach such a situation even though the claims had misdescribed the article. It is possible that such a modification was made here, but if so then we think such

modification, so far as it runs backward, is void as against public policy. In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute.

■■ The findings of the trial court do not single out the elements of intent. Perhaps it could be said it is implicit in some of the findings. Undoubtedly there must be the intent to work a deceit on the government. Probably the rule of Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, should be applied as a test. If this case involved only the manufacture of a substitute article, without the misbranding, then it should go back for a finding as to whether the parties intended to file a false claim. Then if the trial court should find that these defendants did not intend to pass off the regulators of its own manufacture as the genuine proprietary article (and be paid for it) it probably would be within its province to find the necessary intent was lacking. But with the crude and deliberate mislabeling here, there is only one reasonable conclusion that one may reach. What purpose other than to deceive could it have? In the circumstances, it is believed unnecessary to send the case back for the making of further findings, when only one conclusion is reasonable.

■ No count was made by the trial court as to the number of false claims, because it was of the view that no claim was false. The civil penalty provided is inexact and it would occur to us that a loose count of false claims should not be made. The vouchers on Army forms were prepared by the government. In all, 17 invoices were attached to ten vouchers for the period in dispute. In the absence of evidence that 17 payments were contemplated and that the invoices attached by the army to a single voucher were not sent in together by the supplier, and attached to vouchers by the Army as submitted, it would seem that the number of claims should be computed on the number of vouchers rather than the number of invoices.

Further, the record is unclear as to 250 regulators that were genuine Delco-Remy, although perhaps they were not up-to-date models. These were included in the first 4,086 delivered. Two of the smaller vouchers represent a total of 128 regulators. It would not be amiss to hold that two claims were not proved to be false.[7]

Reversed. A new judgment will be entered against all defendants jointly and severally on eight claims for a total of $16,000.

---

7. The sum of the regulators on the other eight vouchers varies from a low number of 208 to a high of 774. Thus, exclusion of the two vouchers representing a total of 128 regulators is as favorable to defendants as any other possible combination, assuming the validity of the conclusion that the defendants are shown to have filed false claims for 4,086 regulators (less 250 genuine Delco-Remy regulators unidentified as to any one shipment) on 17 invoices attached to ten vouchers.