**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth BARKER, Defendant–
Appellant.**

**Nos. 89–10105, 89–10228.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1990.

Decided Dec. 16, 1991.

As Amended on Denial of Rehearing
June 17, 1992.

Charles O. Morgan, Jr., San Francisco, Cal., for defendant-appellant.

Daniel S. Linhardt, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before: CANBY, NOONAN and RYMER, Circuit Judges.

NOONAN, Circuit Judge:

Kenneth Barker appeals his conviction under 18 U.S.C. § 287 of submitting false claims against the United States in a project that Barker undertook for the Army Corps of Engineers. We reverse.

## BACKGROUND

Kenneth Barker, the defendant, is a civil engineer with extensive experience in large construction projects. For many years he worked for Bechtel Corporation, most notably as construction manager for the northern half of the Alaska pipeline. He also had governmental experience as construction division manager of the Central Sanitary District of Contra Costa County. Ultimately he went into the construction business for himself as president of Lionsgate Company, a firm owned by himself, his wife and sons.

In 1985 Lionsgate bid on the construction of the San Ramon Channel By-pass, a flood control project of the United States Army Corps of Engineers (the Corps). Lionsgate

was not the low bidder—a fact of significance because it was later suggested that Lionsgate had bid unrealistically in order to get the contract and then cheated to recoup its losses. The low bidder was a subsidiary of a large corporation. As the project was set aside for small business, the low bidder was disqualified, and Lionsgate, a genuine small business, got the job.

On inspecting the site, Barker discovered that substantial changes had occurred between his bid and the award. He immediately notified the Corps that the changes in the site required changes in the contract. The consequent dispute led to Barker beginning work on the project in an atmosphere of animosity.

Relations with the Corps did not improve. What happened is relevant here only as explanatory of why the Corps eventually turned its differences with Barker into a criminal investigation. Barker made an end-run around the local Corps officials: that made them mad. Barker requested that one Corps employee be taken off the job because his practices were unsafe; the Corps retaliated by accusing one of the Barker boys of unsafe conduct. The Barker family was scarcely on speaking terms with another local Corps authority. Instead of consolidating his claims in connection with change orders, Barker filed them singly: the resulting 76 claims created an enormous backlog that the Corps failed to process within the period specified by law. Bad blood boiled between the parties. Barker saw himself, as he said at trial, as "a one-man army against the Federal Government." He charged Corps employees with making "phoney," "fabricated" and "totally false" records of his work. The Corps brought allegations of false claims against Barker to the United States Attorney in Sacramento.

Barker was indicted on 64 counts of making false claims against the United States in violation of 18 U.S.C. 287. Of the 76 claims he had filed for Lionsgate, 47 were said to be false. He was alleged to have falsely claimed rates for equipment; falsely inflated costs of leased vehicles; falsely claimed for equipment which was not used

the number of hours claimed; falsely claimed for equipment on standby, when it was not on standby; falsely charged time for the same vehicles and equipment; falsely inflated costs for employees; falsely claimed overtime paid to employees that was not paid; falsely claimed twice for the same employees; falsely claimed for a person not employed on the project; falsely claimed for standby time when employees were not standing by; falsely doublebilling overhead. The total of alleged false claims was $769,078.

The 64 counts were further refined by being subdivided into parts, each part charging a separate and specific crime. In all, Barker was charged with the commission of 104 felonies against the United States, all committed between July 1986 and August 1987.

The jury deliberated over 4 days. Of the 104 felony charges against Barker, the jury found him not guilty of 80, was unable to agree as to 21, and found him guilty of 3.

Barker appeals, challenging the sufficiency of the evidence and raising various other objections.

## ANALYSIS

 Barker contends that there was insufficient evidence to support a conviction on counts 33(b), 48(b), and 57(b). In addressing this contention, we must determine whether the evidence, viewed in the light most favorable to the Government, would permit any rational trier of fact to conclude that the defendant was guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.1969). For a claim to be false it must first be shown not to be in accord with the facts. No reasonable trier of fact could conclude that the claims at issue here were proved to be inaccurate beyond a reasonable doubt. Accepting all inferences favorable to the government but looking at all the evidence before the jury, one cannot find proof of falsity beyond a reasonable doubt.

The government's principal witness as to whether there were in fact any false claims was Stephen Rowe. Rowe held a college degree in civil engineering from San Diego State University, although he was not registered as a civil engineer. He had no formal training in accounting. He had worked for seven years in the Contract Administration section of the Corps as "a claims analyst"; his job was to review documents. Testifying, Rowe presented a chart on which he had marked his conclusions as to each claim for which Barker was indicted. The basis for his conclusions was, usually, a document or documents of Lionsgate that he had reviewed.

Count 33(b) involves a claim made by Barker that he and his sons, Wayne and Paul, worked on Sunday, May 25, 1990. The Barkers testified that all three of them had worked all that weekend, but the government introduced documentary evidence which it contended proved the contrary.

These documents were:

(1) the Daily Construction Quality Control Report for May 25, 1986. The report was prepared by Barker's son, Wayne, the designated "assistant contractor quality control inspector." The report showed that 1 supervisor and 3 pick-up trucks had been at work on this date, which was Sunday of the Memorial Day weekend. An asterisk and a 1 after the entry for pick-up trucks indicated that 1 pick-up had not been used.

(2) the Daily Job Report for May 24, May 25, May 26. The report showed Wayne Barker as "supervisor." It also showed Kenneth Barker and his two sons, Wayne and Paul, as "employees" all three days. The initials K.B., W.C.B., and P.B. and the number 8 × 3 all appear on the sheet.

(3) The Daily Job Report for Tuesday, May 27. Under changes it had a note reading: "K.B., W.C.B., P.R.B. survey Sat.–Mon., W.C.B. recalculates elev. on Sunday due to directive from corps about [illegible] materials." On the following page of the Tuesday report under the space for Additional Comments, it was written "Extra Work ... surveying over weekend W.C.B., P.R.B., K.B."

On the basis of these documents it was Stephen Rowe's testimony that the Tuesday report said that all three Barkers worked only on Saturday and Monday. To reach this conclusion Rowe apparently read what was either a dash or ampersand between "Sat.–Mon." as an ampersand and apparently disregarded the Daily Job Report for May 25 and the additional comment on the Tuesday report. He concluded that $800 had been charged for time on Sunday that had not been worked by Barker and his son Paul.

On cross-examination Rowe, in effect, recanted. His testimony was as follows:

I am not saying they did not work on those days. I am—the daily journals do not support the hours requested.

We put to one side the Barkers' testimony and look solely at what the government produced. It produced one contemporaneous report, that of May 25, 1986, which showed only 1 supervisor had worked on Sunday. The report itself was self-contradictory because it showed two pickups had been used all day—an impossibility for one man. The report was contradicted further by the other contemporaneous documents the government itself introduced—the Daily Job Reports for May 24, 25, 26, and 27, all of which showed all three Barkers worked on Sunday. There was one document, that of May 27, 1986 containing a mark that could have been read as either a dash or ampersand. If it was an ampersand, it was contradicted by the rest of the document which stated that all three Barkers had worked on all three days. No other evidence was offered. Rowe, the government's only witness, explicitly conceded that he had no way of knowing whether the Barkers worked or not.

The jury, the judge, and we on appeal are in exactly the same situation as Rowe. We do not and cannot know whether the Barkers worked on Sunday, May 25, 1986. A self-contradictory report, contradicted on the vital point by all the other contemporary reports, proves nothing. There is not merely a reasonable doubt as to Barker's

guilt; there is total uncertainty as to what in fact is the truth, and that conclusion is reached from the government's evidence, drawing all inferences that might be drawn in the government's favor.

The jury itself gave contradictory responses to the count that presented this issue. The jury was unable to agree on count 33a which charged Barker with overcharging for two three-quarter ton pickups, each used 8 hours on Sunday, May 25, 1986. The jury convicted Barker of count 33b for billing 3 men, instead of 1, on the same date. How did one man use 2 pick-up trucks all day? To have been in doubt on the pick-ups, the jury had to be in the dark as to the men.

As to counts 48A and 57B, Rowe testified that in each of these there were charges under "labor" for the time of the general manager that were "improperly" there. Each was "a duplicate charge." Rowe reached this conclusion because, he said, according to Mr. Traillee, Lionsgate's accountant, the general manager is always in the overhead.

Earlier, Rowe had been asked by the government if he knew what items made up the defendant's overhead. He had answered affirmatively, and he was then asked by the government, "How do you know that?" His answer was:

"The contractor, as the basis of his $1,085 a day extended overhead, presented a derogation of the costs within his G & A overhead pool."

What this answer meant was never explained.

Later, Rowe testified that he had been at a hearing before the Corps' Board of Contract Appeals in October 1987 and heard Traillee, Lionsgate's accountant, say that Barker's wages were always included in overhead. Rowe further testified that Traillee had prepared Exhibit 3-0, a document submitted in evidence by the government. This unsigned sheet of paper is entitled "Lionsgate Salaries, FY 1984, 1985, 1986." Under Wages for "Ken" for the fiscal year ending November 30, 1986 a total of $125,000 is shown, of which $12,500 is attributed to "Direct," $81,250 to "Indi-

rect," and $31,250 to "Home Office." Surprisingly, Rowe testified that this document showed that Barker's wages were always in overhead.

On cross-examination Rowe recanted. He conceded that $12,500 of Barker's wages were shown by this document to be charged directly. He admitted he had no way of knowing whether the amount he said was doublebilled was not in fact a direct charge for Barker, reflected in the $12,500 "capital direct" category and not included in "overhead." He further undermined his direct testimony by acknowledging that there are two kinds of overhead—G & A (General and Administrative) and "job-site." He had no means of knowing whether Traillee had spoken of G & A or job site overhead when Rowe had overheard him. The prosecution made no attempt to clarify what kind of overhead Traillee was talking about.

The one document on which Rowe relied shows the allocation of part of Barker's salary to direct charges distinct from the indirect charges constituting overhead. The document undermines the hearsay report that all of Barker's wages were in overhead. Even putting aside Traillee's actual testimony distinguishing G & A and job site overhead, the document itself is entirely ambiguous. It does not show what Rowe once thought it did show, that any wages claimed by Barker must have been doublebilled because he always was paid through overhead.

Rowe spoke gobbledygook when he did testify about overhead. Rowe did not know what Lionsgate billed for overhead. The jury and judge could not have known, nor can we. A man cannot rationally be convicted of claiming wages for which he was already paid when no one can say whether or not he had been already paid.

 The evidence of knowledge of falsity is, if possible, even less than the evidence of inaccuracy. To be false, a claim must not only be inaccurate but consciously so. As the judge charged the jury, Barker must have known that the claim he filed was false. The verdict implies that the

# 1279

jury found he had such knowledge. But there is zero evidence to support the jury's findings.

Rowe knew nothing of Barker's state of mind. Eugene Shy, another employee of the Corps, testified that he believed that Barker wanted to get $5 million out of the contract—no evidence at all that Barker knowingly falsified a few thousand dollars worth of claims. Apart from Shy, not a scintilla of evidence on knowledge was offered. Shy's testimony is insufficient to establish Barker's state of mind.

The government may have assumed that it could prove such a pattern of unjustified charges that a knowledge of falsity might be inferred from their number. *See United States v. National Wholesalers*, 236 F.2d 944, 950 (9th Cir.1956). Whatever the government's hope in this regard, when it failed to prove over 99% of its dollar claims and when the trial judge ordered a judgment of acquittal on the counts "that we are really here for," no inference was warranted as to the knowledge governing the three alleged inaccuracies. On over $760,000 of claims that the government said were false and on over an additional $1.6 million that the government did not even challenge, Barker appears to have been entirely honest. Without concrete proof no reasonable trier of fact could find that on some $6,000 worth of claims he knowingly falsified.

We are not dealing here with a regulatory statute that imposes absolute liability regardless of knowledge. We are dealing with a case where there must be knowledge of the falsity of the facts asserted, see *Morisette v. United States*, 342 U.S. 246, 270–271, 72 S.Ct. 240, 253–254, 96 L.Ed. 288 (1952). To convict under section 287, the government had to prove that Barker knew the statements were false at the time that he made them. *United States v. Milton*, 602 F.2d 231, 233 (9th Cir.1979). That it did not do.

We need not reach the other issues raised by Barker.

REVERSED.

RYMER, Circuit Judge, dissenting:

I dissent because all of the matters about which Judge Noonan writes so passionately were resolved by the jury, who acquitted Barker on most charges but convicted on these, and the district judge, who denied Barker's motion for a new trial on these counts. The jury was entitled to disbelieve the Barkers, and I respectfully disagree that we should serve as the fourteenth, fifteenth and sixteenth jurors.

There was evidence on each of the counts of conviction on which the jury could find Barker guilty beyond a reasonable doubt. On Count 33(b), there were daily reports signed by Wayne Barker as well as quality control reports which showed that three supervisors worked Saturday and Monday, but only one worked on Sunday. Contrary to the spin Barker put on the records, there was evidence that asterisks were used to indicate that equipment was checked out but not in use, so that the jury could find that while three pickup trucks were on the site on Sunday, only one supervisor was present. Thus it could reasonably have concluded that Barker's claim for payment for three supervisors for all three days was false.

On Counts 48(b) and 57(b) there was evidence that Barker charged the government twenty-five percent for overhead throughout the project and in all claims except for these two, he did not bill the government for his time. Barker's accountant said that Barker's wages were always included in overhead costs, and that if a person's wages are normally billed as a part of overhead and then are shifted and billed as a direct cost, the overhead charge should show a corresponding decrease. Exhibits showed that the overhead for the claims at issue was the same as the claims on which Barker's salary was not direct billed. Based on the absence of any corresponding decrease in overhead, the jury could find beyond a reasonable doubt that the claims were false.

As the government had no obligation to prove intent to defraud, but merely that the claims were false, *United States v.*

*Milton,* 602 F.2d 231 (9th Cir.1979), I would affirm.