**UNITED STATES of America, Appellee,**

v.

**Alvin Michael MAHER, Appellant.**

No. 77–2471.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1978.

Decided Aug. 23, 1978.

Plato Cacheris, Washington, D. C. (Larry S. Gondelman, Hundley & Cacheris, P. C., Washington, D. C., on brief), for appellant.

---

Theodore S. Greenberg, Asst. U. S. Atty., Alexandria, Va. (Joseph A. Fisher, III, Asst. U. S. Atty., William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellee.

Before BUTZNER and HALL, Circuit Judges, and NORTHROP, District Judge.*

K. K. HALL, Circuit Judge:

Defendant, Alvin Michael Maher, appeals his criminal conviction on eleven counts of filing false, fictitious, or fraudulent claims with the United States government in violation of the False Claims Act, 18 U.S.C. § 287. The primary issue presented in this appeal is whether the district court properly instructed the jury that under § 287 the criminal intent essential for conviction is not limited to a specific intent to defraud. At trial, the defendant conceded the basic facts of the government's case but maintained he was innocent because he acted without a specific intent to defraud the government. The district court refused to instruct the jury that proof of such a singular purpose was essential for conviction and, instead, instructed the jury that if the defendant caused false or fictitious or fraudulent claims to be submitted to the government, knowing them to be false or fictitious or fraudulent, with a specific intent to violate the law or with a consciousness that what he was doing was wrong, he should be found guilty. The defendant made timely objection to this instruction and to the court's refusal to give his proffered instructions which set forth his theory of defense. We hold that the district court properly instructed the jury and, therefore, affirm.

At trial, the government presented evidence showing that, during the year in which defendant was promoted from vice-president to president of his corporate employer, he caused false vouchers to be submitted to an agency of the federal government requesting payments totalling approximately $68,000 more than should have been paid to his employer under its contracts with that agency. The defendant contended that he did so with no intent to cheat the government or to gain unfair advantage for himself or his company.

During the time in question, defendant worked for General Environments Corporation ("GEC"), which tested equipment and conducted experiments for various commercial and government clients. GEC's contracts with these clients could be categorized as either "fixed-price" contracts or "time-and-materials" contracts, depending upon the manner in which GEC was to be paid for its work. Under its "fixed-price" contracts, GEC agreed to perform experiments for a certain amount and to bill periodically on the basis of percentage of completion. Under its "time-and-materials" contracts, GEC agreed to perform experiments for a price *not to exceed* a certain amount and to bill periodically on the basis of the amount of labor and materials actually employed in the experiments up to the date of billing. According to the defendant's theory of defense, it was GEC's practice, at least for its contracts with government clients, to stop work on an experiment and seek additional funding from the client anytime GEC's costs met or exceeded its contract price. This practice was followed for such "cost overruns" under both "fixed-price" contracts and "time-and-materials" contracts.

During 1972, one of GEC's government clients was the Mobility Equipment Research and Development Center ("MERDC") of the Department of the Army of Fort Belvoir, Virginia. GEC and MERDC entered into various "time-and-materials" contracts most of which required GEC to conduct several experiments, or "tasks," with separate maximum prices allocated to each task. The hourly rate to be billed by GEC included its overhead and profit and varied according to the classification of labor utilized for each task. GEC billed MERDC monthly for work on these "time-and-materials" contracts. Its month-

* Chief Judge of the United States District Court for the District of Maryland, sitting by designation.

ly billings were prepared by the company bookkeeper based upon time sheets which were filled out and signed by the GEC employees who worked on the MERDC contracts.

In 1972 the defendant became president of GEC. During that year, before and after his promotion, whenever the bookkeeper submitted MERDC billings to the defendant for his approval, he instructed her to change them to reflect more hours than were shown on the employees' time sheets. She made the billing changes that he specified, prepared new time sheets to conform to those billing changes, traced over the employees' signatures on the new time sheets and destroyed the original ones. The defendant told her these changes were necessary because the employees did not know to which contract they should charge their hours and that their signatures had to be traced because there was not time to have the employees sign the revised time sheets. Three GEC project managers, whose time sheets had been altered, testified that, in fact, they knew on which contracts they were working and that they recorded hours on their time sheets according to time spent working on those contracts. They said they were never told that they made errors on their time sheets. The defendant testified that no one in the government knew GEC was billing for the fictitious hours and that he did not discuss his practice of having hours changed on company time sheets with anyone at GEC. Approximately 5,300 fictitious hours, representing $68,000 in false claims, were billed on these MERDC contracts as a result of the defendant's instructions to the bookkeeper. The bookkeeper testified that the practice of changing time sheets ended when defendant left GEC in November, 1973.

Defendant admitted giving these instructions but maintained he was innocent because he acted for a legitimate business purpose and without a motive to defraud the government. He testified that he knew the MERDC contracts were to be paid at an hourly rate for work actually performed, but nevertheless thought they should be billed on the same basis as "fixed-price" contracts, that is, if he considered work on a MERDC task to be one half complete, he should have the bookkeeper bill one half of the maximum price allocated to that task regardless of the amount of labor actually employed.[1]

---

1. The court examined the defendant before the jury as follows:

THE COURT: Mr. Maher, suppose that you had a ceiling on a task of $80,000. It turned out that you could do it for time and materials for $5,000. That's an extreme example.

THE WITNESS: Yes, sir.

THE COURT: You ascertained that it was 50 percent complete. Therefore, you would submit vouchers totalling $40,000, wouldn't you, even though it had only cost you say, $5,000?

THE WITNESS: In that extreme example, yes, that's what would have happened, but it never occurred, because that is very extreme.

THE COURT: But that was your theory?

THE WITNESS: That's right.

THE COURT: That if your ceiling was $80,000, and you could do it for five when it was 50 percent completed, you were entitled to $40,000?

THE WITNESS: Yes. Conversely, if it were $80,000, but it took us $186,000 to do it, and we had already expended $80,000 of effort into it, we only charged $40,000.

THE COURT: If 40 was your ceiling?

THE WITNESS: No, no—50 percent complete, remember, that is just the other side of the coin. The coin always had another side. We had hundreds of tasks and some of them had as many as 20 and 30 subtasks and we were dealing with literally thousands of fixed-price items over a ten-year period.

THE COURT: Even if you had to transfer fictitious hours, you would do it to get your 50 percent up to $40,000, wouldn't you?

THE WITNESS: Or down to $40,000, yes, sir.

THE COURT: Still again, using my example, if your ceiling was 80, and your maximum cost was five, for the time and material, when you were 50 percent through and say, had only expended $2,500 in time and material, you would add enough hours to that to add up to $40,000?

THE WITNESS: That's right, but that would never occur, because the engineer—.

THE COURT: (Interposing) But that's the theory on which you operate?

THE WITNESS: That's right. And conversely, if I could say it again, if it were $80,000, and we were half finished but we had expended the full $80,000, it would not show up. It would only show as $40,000.

Defendant testified that this approach to billing for the MERDC tasks furthered a legitimate business purpose because these tasks were experiments which could not be performed efficiently if they were delayed pending receipt of additional funding each time a cost overrun occurred. When cost overruns did occur, GEC would not get additional contracts and the government would not get fair value for its money.[2] Consistent with this defense, he claimed he knew employees were adjusting hours on their time sheets to prevent cost overruns and delays in their work. One GEC project manager testified that he charged hours on his own time sheets which were actually spent working on MERDC tasks to "fixed-price" contracts in order to prevent cost overruns and delays in completion of those "fixed-price" contracts pending GEC's request for additional funding. Defendant testified that he was aware that some hours were shifted away from MERDC contracts and he wanted to shift them back "to make it come out even." Therefore, in all, he contended that he would have the MERDC tasks billed on the basis of his personal estimations of the percentage each task was completed rather than on the amount of labor employed as shown on the employees' time sheets.

> Now, we just weren't that grossly erroneous. You know, the guys had years of experience. Our people knew what they were doing. And the government engineers knew what they were doing. So we oscillate maybe 10, 15, 20 percent around the number.
> THE COURT: Do you say the government knew that you were putting in fictitious hours—?
> THE WITNESS: No sir.
> THE COURT:—to up that, in my hypothetical, from $2,500 to $40,000?
> THE WITNESS: No. I would say the government knew we were fixed pricing every task. There is two ways to do it. If you're really smart and you're well organized, and you're not growing like we were, perhaps what you could do is go out, get your weekly IBM run, that's why we had the machine, but were trying to get ahead of the thing and see if we could tell a person what to charge to, so as to reflect the amount of work done and that's what's done in a lot of time and material contracts now, when you have the information.

■ The primary issue presented in this appeal is whether the intent essential for conviction under § 287 is limited to an intent to defraud. This statute reads as follows:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 287. The court instructed the jury that, in addition to proving the defendant knowingly caused false claims to be made to the government, the government had to prove beyond a reasonable doubt that the defendant acted "willfully," that is, with either a consciousness that he was doing something wrong or with a specific intent to violate the law. In his closing argument, counsel for defendant argued to the jury that the government had to prove the defendant acted with a specific intent to defraud the government in order for the defendant to be found guilty. The court refused to define criminal intent in terms of

> We just didn't have the information that ready. We had too many tasks, too few people. And we were always behind the power curve. That was the time the Vietnam War was really heating up and all of that work was dumping down on us.
>
> *   *   *   *   *   *
>
> 2. In his words, if one billed on an hourly basis, ". . . in the testing business, you wouldn't get any testing done and you certainly wouldn't get it done very efficiently.
> You can't run a test program and go bang up against the task, run out of money and stop. Everybody . . . goes to other work and then wait a month, two months . . . sometimes three months—then go find your equipment again, hook it back up again and start over again.
> You can do that, but you're not going to do it very efficiently. Remember, if we didn't do a good service, if we didn't do good work, we didn't get any work the next time, so we were really interested in giving the government good value for the dollar. That's why we did it."

intent to defraud and instructed the jury on intent, in pertinent part, as follows:

. . . It is sufficient if one . . [claim in each count] . . . is false or fraudulent or fictitious, provided, of course, that in order to convict the defendant, it must be shown as to that item that he had knowledge of its falsity or fraudulent character or fictitious character, and that he acted willfully.

The defendant . . . asserts that he acted innocently and for a legitimate business purpose, with no specific intent to do what the law forbids.

If, of course, the government has not proven beyond a reasonable doubt that he acted with specific intent, that is, willfully, then he cannot be convicted.

In this regard, however, you are told that if the contract was a time and material contract, even with a ceiling, then the contractor . . . had no right to put on or cause to be put on a voucher, a claim for payment for work that he knew had not been done or put on such a voucher a claim for payment with reckless indifference as to whether the work had been done or not, that is, or whether the claim was true or false.

However, even if this is shown, the defendant of course cannot be convicted unless it is shown that he acted with a specific . intent, as that term . . . will be defined for you . . ..

You heard reference during the closing argument to whether the government got its money's worth. Whether the government got its money's worth or not on these contracts is not the issue in the case. And that is no defense to any count if the claim referred to in that count, as submitted, was false or fraudulent or fictitious, and the defendant knew it was either false or fraudulent or fictitious, and acted willfully.

As indicated before, the crime charged in this case requires proof of specific intent before the defendant can be convicted. Specific intent, as that term implies, means more than the general intent to commit the act.

To establish specific intent, the government must prove the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case. And intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind, but you may infer the defendant's intent from the surrounding circumstances.

Two hours after it began deliberations, the jury requested further instruction on whether "criminal intent to defraud was a primary consideration for guilt or innocence." Then the court instructed the jury, in pertinent part, as follows:

Criminal intent to defraud may or may not be a primary consideration for guilt or innocence. You will recall that the act that the defendant is charged with violating is the submitting of a claim, knowing the claim to have been false or fraudulent or fictitious.

Now, as an overall proposition, whether any one or all of those you find to be the case here, whether the claim was false or fraudulent or fictitious, the defendant, to be convicted, must be found to have had the specific intent to violate the law.

That is, he must have had a consciousness that what he was doing was wrong. Whether it is specific intent to defraud is not necessarily the only consideration, but he must have had the specific intent to do something he knew the law forbade.

That is, he must have had a consciousness that what he did was wrong, or he must have acted—well—yes, the specific intent is the specific intent to do something the law forbids.

Now, that may or may not be fraud. Fraud is only one of the three things he may have had a consciousness of what he was doing and what was going on. It could be false, as the term is defined for you, and fraudulent, as that term was defined for you, or fictitious.

Then the court read § 287 in its entirety to the jury.

Therefore, on the issue of criminal intent, we hold the court properly instructed the jury that § 287 may be violated by the submission of a false claim, a fictitious claim or a fraudulent claim, if, in each instance, the defendant acted with knowledge that the claim was false or fictitious or fraudulent and with a consciousness that he was either doing something which was wrong, *see United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973) or which violated the law, *see United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970).

The defendant contends that the court committed error in refusing to instruct the jury that the intent essential for conviction under § 287 is limited to a specific intent to defraud the government. The instructions proffered by defendant on his theory of defense, which the court refused to give, implied that unless the jury found that in submitting the false claims the defendant acted with a purpose to either cheat the government or to unjustly benefit himself or his company, he should be found innocent. We disagree for three reasons.

First, we do not find that the statute specifies an intent to defraud as an element to be proved under § 287. The language of the statute states the terms, "false, fictitious or fraudulent," in the disjunctive, and we interpret this to mean that three kinds of claims may be submitted in violation of § 287 and not merely claims which are fraudulent. *Compare United States v. Snider*, 502 F.2d 645 (4th Cir. 1974) *with United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47 (8th Cir. 1973). The statute is silent on motive and criminal intent and only specifies that the claims be submitted with a knowledge that they are false, fictitious or fraudulent.

Second, in applying general principles of criminal law, the court added the element of "willfulness" or criminal intent to the requirements of the government's case, and we think correctly refused to define criminal intent under § 287 solely in terms of purpose or motive. Criminal intent may be proved either by a showing that the defendant acted for a specific purpose to violate the law or that he acted with an awareness that what he was doing was morally wrong, whether or not he had actual knowledge that he was doing something that the law forbids. Proof of motive is relevant on the issue of criminal intent but is not determinative of it. The defendant could have formed the requisite criminal intent by acting with a consciousness that he was doing something wrong while pursuing a legitimate business goal, or he could have been aware of the prohibitions of the False Claims Act and could have chosen to pursue his business goals in spite of those prohibitions hoping that his illegal acts would not be discovered. Whether or not the defendant formed such a criminal intent is a question for the trier of fact. At defendant's trial, the jury was instructed that criminal intent essential for conviction under § 287 could be proved by either a showing that the defendant was aware that he was doing something wrong or that he acted with a specific intent to violate the law. After hearing the defendant's evidence, his counsel's arguments and the court's reference to his theory of defense in its initial instruction on criminal intent, the jury returned a verdict of guilty. Based upon the evidence of record, we think the jury was justified in finding the defendant acted with a criminal intent. He admitted having the bookkeeper alter company records which substantiated the false claims at issue, and he admitted causing her to trace employees' signatures on those altered records without their consent or knowledge. Whether or not the jury chose to credit defendant's claims of good or justifiable motive, we think such attempts to substantiate the false claims constitute good evidence of the requisite criminal intent to be proved under § 287.

Third, we think that § 287 does not require proof of a specific intent to defraud, as defendant defines that term, because the purpose of § 287 will not be furthered by limiting criminal prosecutions to instances where the defendant is motivated solely by an intent to cheat the government or to gain an unjust benefit. The plain purpose

of § 287 is to assure the integrity of claims and vouchers submitted to the government. Federal criminal statutes written in language similar to § 287 which have specified intent to defraud as an element to be proved have been interpreted to require only proof that the defendant acted "for the purpose of impairing, obstructing, or defeating" a lawful function of the government. *Pina v. United States*, 165 F.2d 890, 893 (9th Cir. 1948). In *Pina*, it was held as well-settled, that "the contemplated infliction of a monetary loss upon the Government is not a necessary ingredient of an intent to defraud the United States." 165 F.2d at 893. Such an interpretation is consistent with common law, in that, a common law prosecution for forging or for uttering a false writing could not be defended by a showing that the defendant's purpose was only to use the false writing as a device to collect a bona fide debt. R. Perkins, *Criminal Law* 303–307 (1st Ed. 1957).

The defendant supports his contention that intent to defraud is essential for conviction under § 287 by arguing that in some jurisdictions specific intent to defraud is essential to give rise to civil penalties under 31 U.S.C. § 231, a civil penalty statute stated in part in language similar to § 287, and by asserting that the element of material falsity imports a requirement of an intent to defraud under our holding in *United States v. Snider, supra.* We find no merit in either of these arguments. Unlike § 231, § 287 requires proof of a criminal act, rather than proof of a civil wrong. *See generally, United States v. Miller*, 545 F.2d 1204, 1213 (9th Cir. 1976). Under § 287, the government must prove beyond a reasonable doubt that the defendant performed forbidden acts with a criminal intent. The prohibition of the statute is absolute in that the defendant's liberty is at stake. Under § 231, the government is empowered to enforce the underlying civil duty to submit to the government only valid claims for payment by bringing an action for imposition of civil penalties. The nature of the proceedings, the standards of proof, and the defendant's interests at stake are wholly different under these two statutes, and in construing § 287 we do not find either authority or persuasion in defendant's analogy to § 231.[3] Also, we do not think that our holding in *United States v. Snider, supra,* supports defendant's contention. In that case we were construing a criminal tax fraud statute and held that in order for a taxpayer to be convicted of supplying "false or fraudulent" information, the information must either be supplied with an intent to deceive *or* be of such a nature that it could reasonably affect withholding to the detriment of the government. 502 F.2d at 655.

■ Finally, defendant has raised as an issue in this appeal, the court's refusal to give the defendant's proffered instructions which summarized the evidence of his theory of defense. We think the court properly refused to give these instructions because they were contrary to law as previously stated. Furthermore, because the court included the defendant's claims of good or justifiable motive in its initial instructions on the issue of criminal intent and because the jury apparently gave considerable weight to this defense in its deliberation on that issue as indicated by its inquiry to the court regarding "criminal intent to defraud", we can find no merit, in fact, to defendant's objection on this ground.

Therefore, judgment of conviction is

*AFFIRMED.*

---

**3.** Likewise, we note that under § 231 there is a split of authority on the issue of whether a specific intent to defraud must be proved by the government in order to maintain its actions under that civil statute, and we expressly disclaim any implication in our holding today that such an intent is or is not required as an element of proof under § 231.