UNITED STATES of America, Plaintiff–Appellee,

v.

Kenneth BARKER, Defendant–Appellant.

Nos. 89–10105, 89–10228.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1990.

Decided April 17, 1991.

As Amended on Denial of Rehearing Aug. 7, 1991.

Charles Morgan, San Francisco, Cal., for defendant-appellant.

Daniel S. Linhardt, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before CANBY, NOONAN, and RYMER, Circuit Judges.

### ORDER

The opinion filed April 17, 1991 and reported at 930 F.2d 1408 is amended by deleting at 1410, right column, first full paragraph the second sentence beginning "The jury reviewed Lionsgate's accounting documents ..." and replacing it with the following:

The jury reviewed an accounting document prepared by Lionsgate's accountant for an appearance before the government Contract Board of Appeals, and this document was capable of being construed to support the government's double-billing contention.

With this amendment the petition for rehearing is denied. Judge Noonan dissents; he would grant the petition for rehearing.

## OPINION

CANBY, Circuit Judge:

Kenneth Barker was president and general manager of Lionsgate Corporation, a family construction business. The Army Corps of Engineers contracted with Lionsgate to construct a quarter mile concrete channel for flood control purposes. Lionsgate performed work beyond the scope of the contract because of changed site conditions, design errors, and changes in government plans. Barker submitted 74 claims to the government for claimed extra costs.

The government, in turn, charged Barker with sixty-four counts of presenting false, fictitious, or fraudulent claims to the United States, in violation of 18 U.S.C. § 287.[1] A jury found Barker guilty on three counts[2], was unable to reach a verdict on twenty-two counts, and acquitted him on the remaining counts. The district court granted a judgment of acquittal on two of the counts on which the jury reached no verdict. On the three counts of conviction, the district court denied Barker's post-verdict motion for a judgment of acquittal and his alternative motion for a new trial.

Barker contends that the evidence is insufficient to support the conviction, and that the district court therefore improperly denied his motion for judgment of acquittal and his motion for a new trial. Barker further contends that the jury should have been instructed that section 287 is not violated when a false charge is offset by an undercharge on the same claim. In addition, Barker argues that the district court erred by allowing an unqualified witness to testify as an expert. And finally, Barker contends that section 287 violates his First Amendment right to petition the government for redress of grievances.

We affirm the judgment of the district court.

## ANALYSIS

### I. Sufficiency of the Evidence

■ Barker contends that there was insufficient evidence to support a conviction on counts 33(b), 48(b), and 57(b). In addressing this contention, we must determine whether the evidence, viewed in the light most favorable to the Government, would permit any rational trier of fact to conclude that the defendant was guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.1969).

Count 33(b) involves a claim made by Barker that he and his sons, Wayne and Paul, worked on Sunday, May 25, 1990. The Barkers testified that all three of them had worked all that weekend, but the government introduced documentary evidence to the contrary. Barker responds that the daily job report, which indicates that only one person had worked that day, also shows three pickup trucks at the site. Barker argues that the entry showing one worker must be in error because one worker could not use three trucks. The jury was entitled, however, to conclude that if there was any error it was in the entry regarding the pickup trucks. Its conclusion was supported as well by a quality control report indicating that only one supervisor worked all three days of the Memorial Day weekend in issue.

Counts 48(b) and 57(b) required the jury to determine whether Barker was double billing the government by calculating his compensation as both a direct cost and as part of overhead. The jury reviewed an

---

**1.** 18 U.S.C. § 287 provides:

"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**2.** Count 33(b) charged the billing of labor time not actually worked. Counts 48(b) and 57(b) charged the billing of Barker's salary both directly and in overhead.

accounting document prepared by Lionsgate's accountant for an appearance before the government Contract Board of Appeals, and this document was capable of being construed to support the government's double-billing contention. In addition, the jury heard testimony by a government's witness and by Lionsgate's accountant regarding the computation of overhead and direct charges. The government's witness testified that Lionsgate's accountant had in an earlier proceeding admitted that Barker's salary was included in overhead.[3] Lionsgate's accountant testified that, when a person who is normally charged in overhead is being charged as a direct cost, the percent of overhead for the project should show a decrease, yet exhibits here showed no decrease in the overhead percentage when Barker's services were directly billed.

■ Although the evidence presented at trial was open to alternative interpretations, it was not so unreliable as to cause us to depart from the rule that determining the credibility of witnesses and assessing conflicting evidence is a matter for the jury. *See United States v. Taylor*, 716 F.2d 701, 711 (9th Cir.1983). The evidence was sufficient to support the verdicts against Barker. Likewise, the weight of the evidence, though not overwhelming, justifies the district court's decision to deny Barker's motion for a new trial.[4] *See*

*United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir.1981). (In applying abuse-of-discretion standard, a motion for a new trial is granted only in exceptional circumstances in which the evidence weighs heavily against the verdict).

## II. Offsetting Undercharges

■ Barker also contends that the district court erred in denying his proposed instruction that required the jury to determine whether the claim contained undercharges that would offset any overcharges.[5] A defendant is entitled to an instruction concerning his theory of the case if it is supported by law and has some foundation in the evidence. *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir. 1985). Here, we conclude that Barker's proposed instruction is not supported by law.[6]

Section 287 provides for the punishment of any person who presents a claim to the United States "knowing such claim to be false, fictitious, or fraudulent." Barker draws from this language a requirement that the total amount claimed, after other corrections and adjustments, must itself be fraudulently overstated. We disagree. Section 287 contains no requirement that the intent, purpose, or effect of the false claim must be to cause the government a loss.[7] "[T]he purpose of 18 U.S.C. § 287

---

**3.** Barker contends that the court erred in admitting the evidence of this witness because it was not corroborated and it was vital to the Government's case. Because the jury could have based its verdict on the other evidence presented, we need not address the issue of whether the admission must be corroborated. *See Smith v. U.S.*, 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954).

**4.** Because the trial judge at one point opined that he probably would not have convicted Barker if he had been the trier of fact, Barker contends that the verdict must have been against the great weight of the evidence. We disagree. The two positions are quite distinct, and the trial judge clearly, stated that he could not say that the verdict was against the weight of evidence, or that the jury had been wrong.

**5.** Barker's Proposed Instruction No. 16 stated: "In determining whether a claim is false you should consider the entire claim. If there are any undercharges that offset any overcharges

then, in that event the claim can not be false, fictitious or fraudulent."

**6.** Our cases have not been consistent regarding the proper standard for reviewing a district court's denial of a proposed jury instruction on the defendant's theory of the case. *See United States v. Sotelo–Murillo*, 887 F.2d 176, 179–80 (9th Cir.1989). With regard to the determination whether the proposed instruction is supported by law, review de novo appears to be more appropriate than review for abuse of discretion. *See id.* We need not decide that question here, however, for our conclusion would be the same under either standard.

**7.** A rough parallel may be drawn between section 287 and 26 U.S.C. § 7207, which prohibits submission of tax returns or statements known by the submitter to be fraudulent or false as to any material matter. Unlike some other sections of the Internal Revenue Code, section 7207 contains no requirement of intent to evade taxes. "Conduct could therefore violate § 7207 ...

would be frustrated if criminal prosecutions were limited merely to those instances 'where the defendant is motivated solely by an intent to cheat the government or to gain an unjust benefit.' " *United States v. Milton*, 602 F.2d 231, 234 (9th Cir.1979) (quoting *United States v. Maher*, 582 F.2d 842, 847 (4th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979)).

The instructions that were given to the jury made it clear that Barker could not be convicted unless he had made the false or fraudulent statements with the knowledge of their falsity or fraudulency, and that he had made them willfully with a bad purpose. When a claim is made to the government, the government must be able to verify the claim by scrutinizing the information that the claimant has supplied. Willfully false statements obviously frustrate that function. Such an intentional impairment of a legitimate governmental function satisfies any requirement of fraud in section 287. *Maher*, 582 F.2d at 848.

"The plain purpose of section 287 is to assure the integrity of claims and vouchers submitted to the government." *Id.* at 847–48. That purpose would not be served by permitting a claimant who had knowingly and willfully submitted a false item in a claim to escape all consequences if he is able to demonstrate an unrelated, previously unstated, and possibly quite inadvertent offsetting undercharge. *See id.* We conclude, therefore, that the district court did not err in refusing to give Barker's requested instruction.

### III. *Competency of an Expert*

██ Barker further contends that a government witness, Steven Rowe, was not qualified to testify as an expert witness under Federal Rule of Evidence 702.[8] Whether to admit expert testimony in a criminal trial is a decision left to the discretion of the trial judge, and we will not overturn that decision in the absence of an abuse of such discretion. *See United States v. Marabelles*, 724 F.2d 1374, 1381 (9th Cir.1984).

Here, Rowe was a civil engineer working for the Corps of Engineers as a claims analyst. He had analyzed claims and reviewed contractor's documents for approximately seven years. His testimony may well have assisted the jury in understanding the evidence or determining a fact in issue. *See United States v. Binder*, 769 F.2d 595, 602 (9th Cir.1985). It was not an abuse of discretion for the trial judge to admit Rowe's testimony.

### IV. *The Right to Petition for the Redress of Grievances*

██ Finally, Barker contends that the government violated his First Amendment right to petition for redress of grievances. Barker argues that the First Amendment right will be chilled because anyone who files a claim against the government does so knowingly, and if subsequently a trier of fact determines the claim to be false, that person will have violated section 287. This is an improper construction of the law. For a claimant to be in violation of section 287, the trier of fact must determine that the claimant knew he was filing a *false* claim, not that he merely knew he filed *a* claim. There is simply no constitutional right to file a false claim.[9] This rule poses no conflict with the constitutional right legitimately to petition the government for

---

where the false statement, though material, does not constitute an attempt to evade or defeat taxation because it does not have the requisite effect of reducing the stated tax liability. This may be the case, for example, where a taxpayer understates his gross receipts and he offsets this by also understating his deductible expenses." *Sansone v. United States*, 380 U.S. 343, 352, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965).

**8.** Federal Rules of Evidence 702 permits a witness who is "qualified as an expert by knowledge, skill, experience, training, or education …" to testify as to his opinion.

**9.** The constitutionality of statutes criminally forbidding false statements has been upheld on numerous occasions. *See, e.g., United States v. Des Jardins*, 772 F.2d 578, 580 (9th Cir.1985) (upholding 18 U.S.C. § 1001); *United States v. Staats*, 49 U.S. (8 How.) 41, 12 L.Ed. 979 (1850) (upholding 18 U.S.C. § 289).

**590**

the redress of grievances.[10] Barker's claims, filed with the knowledge that they were false, are not protected by the First Amendment. *See Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983) (baseless litigation is not immunized by the First Amendment right to petition).

## CONCLUSION

The district court's denial of Barker's motion for acquittal and motion for a new trial was proper; the evidence was sufficient to support the jury's verdict. The jury instructions correctly interpreted section 287 to prohibit a petitioner from knowingly submitting *any* false item in a claim submitted to the government for monetary reimbursement. Such a construction of the statute does not run afoul of the First Amendment. Finally, the government's witness had sufficient experience and expertise for the district court, in its discretion, to allow him to testify as an expert.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

It is a fundament of our law that no one should bear the onus of conviction of a crime unless the existence of every element of the crime has been established by proof beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). The convictions in this case are unsupported by evidence necessary to prove beyond a reasonable doubt the existence of the elements of the crimes with which the defendant was charged. We have an obligation of the most serious kind to right the wrong done by a judicial system for which we bear at least partial responsibility.

*Background.* Kenneth Barker, the defendant, is a civil engineer with extensive experience in large construction projects. For many years he worked for Bechtel Corporation, most notably as construction manager for the northern half of the Alaska pipeline. He also had governmental experience as construction division manager of the Central Sanitary District of Contra Costa County. Ultimately he went into the construction business for himself as president of Lionsgate Company, a firm owned by himself, his wife and sons.

In 1985 Lionsgate bid on the construction of the San Ramon Channel By-pass, a flood control project of the United States Army Corps of Engineers (the Corps). Lionsgate was not the low bidder—a fact of significance because it was later suggested that Lionsgate had bid unrealistically in order to get the contract and then cheated to recoup its losses. The low bidder was a subsidiary of a large corporation. As the project was set aside for small business, the low bidder was disqualified, and Lionsgate, a genuine small business, got the job.

On inspecting the site, Barker discovered that substantial changes had occurred between his bid and the award. He immediately notified the Corps that the changes in the site required changes in the contract. The consequent dispute led to Barker beginning work on the project in an atmosphere of animosity.

Relations with the Corps did not improve. What happened is relevant here only as explanatory of why the Corps eventually turned its differences with Barker into a criminal investigation. Barker made an end-run around the local Corps officials: that made them mad. Barker requested that one Corps employee be taken off the job because his practices were unsafe; the Corps retaliated by accusing one of the Barker boys of unsafe conduct. The Barker family was scarcely on speaking terms with another local Corps authority. Instead of consolidating his claims in connection with change orders, Barker filed them

---

**10.** *United States v. Hylton*, 710 F.2d 1106 (8th Cir.1983), relied on by Barker, is not to the contrary. In that case, Hylton had filed factually accurate criminal complaints against federal agents, and the government retaliated by charging her with the crimes of corruptly endeavoring to impede IRS agents in the exercise of their duties and of obstruction of justice. In holding that the government's retaliatory action violated Hylton's First Amendment rights, the court stated that "were it demonstrated that Hylton's complaints were frivolous and based upon contrived allegations, a totally different result might follow." *Id.* at 1112.

singly: the resulting 76 claims created an enormous backlog that the Corps failed to process within the period specified by law. Bad blood boiled between the parties. Barker saw himself, as he said at trial, as "a one-man army against the Federal Government." He charged Corps employees with making "phoney," "fabricated" and "totally false" records of his work. The Corps came to see Barker as an intolerable pain in the butt. It repaid Barker's rhetoric and brought allegations of false claims against Barker to the United States Attorney in Sacramento.

The United States has assured the court that it did not rubber stamp the Corps' complaints, but took an independent look. No doubt a different set of government officials reviewed the facts. The prosecutor, however, as his case was to show, essentially relied on a local Corps employee for an analysis of Barker's claims and proof of his criminal liability.

*The Government's $769,078 Case.* Barker was indicted on 64 counts of making false claims against the United States in violation of 18 U.S.C. § 287. Of the 76 claims he had filed for Lionsgate, 47 were said to be false. He was alleged to have falsely claimed rates for equipment; falsely inflated costs of leased vehicles; falsely claimed for equipment which was not used the number of hours claimed; falsely claimed for equipment on standby, when it was not on standby; falsely charged time for the same vehicles and equipment; falsely inflated costs for employees; falsely claimed overtime paid to employees that was not paid; falsely claimed twice for the same employees; falsely claimed for a person not employed on the project; falsely claimed for standby time when employees were not standing by; falsely doublebilling overhead. The total of alleged false claims was $769,078.

The 64 counts were further refined by being subdivided into parts, each part charging a separate and specific crime. In all, Barker was charged with the commission of 104 felonies against the United States, all committed between July 1986 and August 1987.

*How the Government Proved Its Case.* The government's principal witness as to whether there were in fact any false claims was Stephen Rowe. Rowe held a college degree in civil engineering from San Diego State University, although he was not registered as a civil engineer. He had no formal training in accounting. He had worked for seven years in the Contract Administration section of the Corps as "a claims analyst"; his job was to review documents. Over the defendant's objection, Rowe was permitted to present a chart on which he had marked his conclusions as to each claim for which Barker was indicted. The basis for his conclusions was, usually, a document or documents of Lionsgate that he had reviewed. At the beginning of his testimony he was introduced by the government as "a summary witness" [TR., Nov. 17, P. 15]. The court noted that his summary had to be based on admissible documents. There was no attempt by the government to qualify him as an expert. There was no suggestion by the government that he had any information about the motivations or intentions of Barker. Rowe just looked at this or that piece of paper and pronounced it to be an overcharge or doublebilling.

The government buttressed Rowe with the testimony of Eugene Shy, chief of the Contract Administration Section, Construction Branch, Construction Operations Division of the Corps in Sacramento. Shy testified that Barker told him that he expected the final cost of the contract to be $5 million. The contract, as written, was for $2.6 million. Barker, Shy testified, had submitted claims of $2.4 million. The inference was possible that Barker was filing claims for change orders with the intent of reaching his announced goal of $5 million. There was, however, no testimony linking this inferred intent to specific claims or to the $1.6 million of claims that the government was not charging to be false. Shy's testimony proved expectation and prediction by Barker; it did not show his specific intent as to any claim.

As to count 33a the following documents were put in evidence by the government.

(1) the Daily Construction Quality Control Report for May 25, 1986. The

report was prepared by Barker's son, Wayne, the designated "assistant contractor quality control inspector." The report showed that 1 supervisor and 3 pick-up trucks had been at work on this date, which was Sunday of the Memorial Day weekend. An asterisk and a 1 after the entry for pick-up trucks indicated that 1 pick-up had not been used.

(2) the Daily Job Report for May 24, May 25, May 26. The report showed Wayne Barker as "supervisor." It also showed Kenneth Barker and his two sons, Wayne and Paul, as "employees" all three days. The initials K.B., W.C.B., and P.B. and the number 8 × 3 all appear on the sheet.

(3) The Daily Job Report for Tuesday, May 27. Under changes it had a note reading: "K.B., W.C.B., P.R.B. survey Sat.–Mon., W.C.B. recalculates elev. on Sunday due to directive from corps about [illegible] materials." On the following page of the Tuesday report under the space for Additional Comments, it was written "Extra Work ... surveying over weekend W.C.B., P.R.B., K.B."

On the basis of these documents it was Stephen Rowe's testimony that the Tuesday report said that all three Barkers worked only on Saturday and Monday. To reach this conclusion Rowe apparently read what was either a dash or ampersand between "Sat.–Mon." as an ampersand and apparently disregarded the Daily Job Report for May 25 and the additional comment on the Tuesday report. He concluded that $800 had been charged for time on Sunday that had not been worked by Barker and his son Paul.

On cross-examination Rowe, in effect, recanted. His testimony was as follows:

I am not saying they did not work on those days. I am—the daily journals do not support the hours requested [TR. Nov. 29, p. 251].

As to counts 48A and 57B, Rowe testified that in each of these were charges under "labor" for the time of the general manager that were "improperly" there. Each was "a duplicate charge." Rowe reached this conclusion because, he said,

according to Mr. Traillee, Lionsgate's accountant, the general manager is always in the overhead.

Earlier, Rowe had been asked by the government if he knew what items made up the defendant's overhead. He had answered affirmatively, and he was then asked by the government, "How do you know that?" His answer was:

"The contractor, as the basis of his $1,085 a day extended overhead, presented a derogation of the costs within his G & A overhead pool."

What this answer meant was never explained. The defendant strongly objected to Rowe's competency to testify as to overhead.

Later, Rowe testified that he had been at a hearing before the Corps' Board of Contract Appeals in October 1987 and heard Traillee, Lionsgate's accountant, say that Barker's wages were always included in overhead. Rowe further testified that Traillee had prepared Exhibit 3–0, a document submitted in evidence by the government. This unsigned sheet of paper is entitled "Lionsgate Salaries, FY 1984, 1985, 1986." Under Wages for "Ken" for the fiscal year ending November 30, 1986 a total of $125,000 is shown, of which $12,500 is attributed to "Direct," $81,250 to "Indirect," and $31,250 to "Home Office." Surprisingly, Rowe testified that this document showed that Barker's wages were always in overhead.

On cross-examination Rowe recanted. He conceded that $12,500 of Barker's wages were shown by this document to be charged directly. He admitted he had no way of knowing whether the amount he said was doublebilled was not in fact a direct charge for Barker, reflected in the $12,500 "capital direct" category and not included in "overhead." He further undermined his direct testimony by acknowledging that there are two kinds of overhead—G & A (General and Administrative) and "job-site." He had no means of knowing whether Traillee had spoken of G & A or job site overhead when Rowe had overheard him. The prosecution made no attempt to clarify what kind of overhead Traillee was talking about.

*The Defendant's Case.* In addition to cross-examining Rowe and leading him to recant, the defense put on the witness stand the defendant himself, his two sons, and his accountant, Traillee.

All three Barkers testified that all of them had worked all three days of the Memorial Day weekend. The necessity had arisen because the Corps had changed its mind about the use of sand filter. A great many calculations had to be redone, so that the project could go ahead on Tuesday. The recalculations were tedious, time-consuming work that needed three men to complete. Not all of it had to be done at the job site. The records, prepared by Wayne Barker, accurately showed that all three had worked although all three were not at the job site all of Sunday.

Kenneth Barker testified that there had been no doublebilling of his time. As to each of the claims involved in this appeal, he further testified that there had been undercharges, which, if taken into account as they should be, meant that the government far from being overcharged had not been charged enough.

Traillee, an independent certified public accountant, testified that for extra work as a result of a change order there could be a charge for job site overhead that was distinct from G & A overhead. His testimony effectively contradicted the hearsay reported by Rowe, that all Kenneth Barker's wages were in "the overhead." The government—which had preferred Rowe's hearsay to Traillee as a witness—made no attempt to rehabilitate Rowe by cross-examining Traillee on overhead.

*The Jury's Verdict.* The jury deliberated over 4 days. Of the 104 felony charges against Barker, the jury found him not guilty of 80, was unable to agree as to 21, and found him guilty of 3. The government had charged him with over $760,000 in false claims. They had persuaded the jury as to a total of less than 1 percent of what the government said was false.

*The Trial Court's Reaction.* On motions by the defendant for acquittal or a new trial, the court observed: "From the outset it's a sad case—sad because it was somewhat blown out of proportion by the number of counts that were filed, but even more sad from the ultimate result."

As to count 33, the trial judge stated that he would have acquitted. He was, he stated, "surprised, even shocked by the finding." But he declined to set aside the verdict because he could not find "a miscarriage of justice." [TR, Feb. 15, P. 2834].

As to the counts of conviction based on doublebilling for overhead, the trial judge engaged in a pun that was a putdown of the government's only witness on overhead. "Rowe," he stated, "was in over his head." [*Id.*, P. 2385]. The trial judge also said, "We should have had better competent witnesses before the Court," and, again, "We should have had accountants here. We should have had better investigation and better providing of evidence before the court in regard to the overhead and the deduction of base salary as an amendment always applied to overhead, etcetera, etcetera. We didn't have that. What we had was shortcutting, and Mr. Rowe making some assumptions on the testimony of, I believe, his name was Mr. Traillee, the accountant for Lionsgate." [*Id.*, p. 2836]. Again, the trial judge declined to find "a miscarriage of justice." But as an afterthought, he said: "I still confess I am somewhat confused on the issue of overhead" and added, almost as a plea to this court: "I don't have the thousands of pages of court reporter's transcript in front of me that the Ninth Circuit will certainly have so that they can make the intricate computations that in fact Mr. Morgan has made." [*Id.*, p. 2838].

As to the 21 counts on which the jury had not reached agreement, the trial court expressed the vehement hope that the government would not retry them, adding, "I think it would be a waste of taxpayers' money." To retry Barker would not be, legally, "cruel and unusual punishment," but "would be something along those lines." [*Id.*, p. 2830].

The trial court then went on to focus on counts 63 and 64 where Barker was charged with false claims totalling over $317,000. The court described these claims as "the largest claims pending" and "the

claims we're really here for." The jury had been unable to agree on them. The trial court now granted the motion for acquittal on them. [*Id.*, p. 2841].

The court left standing the felony conviction for $800 of overcharge for the Sunday of the Memorial Day weekend and the felony convictions for the doublebilling of overhead on two occasions amounting to a total of $5,550.

*The Appeal.* The defendant appealed, challenging the sufficiency of the evidence and the competency of Rowe's testimony and contending as well that the jury was improperly instructed because they were not told to offset any overcharge by an undercharge on the claim. The defendant also raised on appeal, as he had at trial, the contention that the First Amendment safeguarded his right to file claims without retaliation by criminal prosecution.

The appeal was directed only to the counts of conviction. The government had accepted the trial court's advise not to retry the counts where the jury had been hung.

## ANALYSIS

1. *What is a claim?* The government cites cases holding that the government does not have to show loss to prevail under the statute. On that point, there is no disagreement. A claim is criminal if it obstructs a governmental function although it causes no loss. *See United States v. White*, 765 F.2d 1469, 1472–73 (11th Cir.1985). It is common ground that what the government had to prove was not the intent to defraud the government but the intent to make a false claim, knowing it to be false. *United States v. Milton*, 602 F.2d 231 (9th Cir.1979); *United States v. Maher*, 582 F.2d 842 (4th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979).

The argument made by Barker that the jury should have considered the undercharges depends on what constitutes "a claim" under 18 U.S.C. § 287. The statute itself sheds no light. The contract between the Corps and Lionsgate, however, details the procedure for the contractor to use in submitting a claim. A claim means "a written demand or written assertion by one of the contracting parties seeking as a matter of right the payment of money in a certain sum." [TR, Nov. 9, p. 199]. It is reasonable to conclude that what is a claim for purposes of the contract is a claim for purposes of criminal prosecution for filing false claims under the contract.

Under this definition it is the bottom line that counts, not the supporting explanation. The entire document making up one claim runs for many pages and has multiple appendices. To hold that falsity in any particular of the document is criminal would be to expand enormously the scope of the statute. The crime is to assert in writing a demand for more money than the contractor is entitled to.

By the same token, if the contractor asks for less money than he is entitled to, he has not made a false claim. Hence the testimony as to undercharging had to be weighed before the jury could conclude that any false claim had been made. Denial of the requested instruction on this point was fatal error.

The conclusion that "the claim" for purposes of the criminal statute means the bottom line is reinforced by the provision in the contract that "if the claim" is for over $50,000, the contractor must certify "that the claim is made in good faith that the supporting data are accurate and complete to the best of the contractor's knowledge and belief and the amount requested accurately reflects the contract adjustments for which the contractor believes the government is liable." [TR, Nov. 9, p. 200].

A clear distinction is made between "supporting data" and "the claim". The claim is monetary. The supporting data are the statements and schedules justifying the claim. Only when the claim is over $50,000 does the government require the contractor's certification as to the supporting data. It would be strange indeed that if what is required civilly and contractually only as supporting data for large claims should be subsumed automatically under a criminal statute applying to all claims. No reason exists to expand "claim" under the statute to include the supporting data.

This distinction between "the claim" and supporting materials has been consistently upheld in cases construing what is "a false claim" for the imposition of criminal or civil liability. In *United States v. Cohn,* 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926) the defendant was charged with violating the criminal False Claims Act because he had caused false statements to be made to Customs officials in order to obtain non-dutiable merchandise from Customs. The Supreme Court held the indictment to be bad. Writing for a unanimous court, Justice Sanford declared: "[A] 'claim upon or against' the Government relates *solely* to the payment or approval of a claim for money or property to which a right is asserted against the Government, based upon the Government's liability to the claimant." *Id.* at 345–46, 46 S.Ct. at 252–53 (emphasis supplied). This case did not focus upon the precise issue before us. The emphasized language, nonetheless, clearly indicates that a "claim" consists solely in the assertion of a right against the government, not in what precedes assertion of that right.

We have reached the same result in cases where the issue was recovery of a civil penalty by the government for the assertion of a false claim against it. Thus, where the government attempted to recover the penalty for each false document attached to an application for government funds, we held that the government could recover, not for each false paper, but only "for each false separate claim for money." *United States v. Woodbury,* 359 F.2d 370, 378 (9th Cir.1966) (Duniway, J.). Similarly, where the government sought recovery of a penalty for each false invoice filed, we held that it could have the penalty only for each false voucher filed, not for each of the attached false invoices. *United States v. National Wholesalers,* 236 F.2d 944, 950 (9th Cir.1956) (Chambers, J.).

Finally, this concept of a claim under the false claim statute converges with the existence of a separate statute which criminalizes "false, fictitious or fraudulent statements or representations" made to the United States, 18 U.S.C. § 1001. It would be very strange if the false claim statute duplicated the statutory prohibition of section 1001; it once formed part of the False Claims Act, 40 Stat. 1015 (1918). Section 1001 prohibits a false statement "that is capable of affecting or influencing the exercise of a government function." *U.S. v. Goldfine,* 538 F.2d 815, 820 (9th Cir.1976). Under § 1001 the government must prove the materiality of the statement but no demand for payment by a claimant. *U.S. v. White,* 765 F.2d 1469, 1472–73 (11th Cir. 1985). Construing § 287 as prohibiting false statements renders § 1001 superfluous—a result contrary to a fundamental canon of statutory construction. *See, e.g., Nieto v. Ecker,* 845 F.2d 868, 873 (9th Cir.1988); *Beisler v. Commissioner,* 814 F.2d 1304, 1307 (9th Cir.1987). *See also U.S. v. Johnson,* 284 F.Supp. 273, 278 (D.Mo.1968) (distinguishing § 287 and § 1001 and stating Congress intended to treat as separate and distinct offenses).

Barker is entitled to a new trial on the ground of flawed instructions alone; but there are further aspects of his appeal to be considered.

2. *The Evidence of Inaccuracy.* For a claim to be false it must first be shown not to be in accord with the facts. No reasonable trier of fact could conclude that the three claims at issue here were proved to be inaccurate beyond a reasonable doubt. Accepting all inferences favorable to the government but looking at all the evidence before the jury, one cannot find proof of inaccuracy beyond a reasonable doubt.

As to the work done on Sunday of the Memorial Day holiday, we put to one side the Barkers' testimony and look solely at what the government produced. It produced one contemporaneous report, that of May 25, 1986, which showed only 1 supervisor had worked on Sunday. The report itself was self-contradictory because it showed two pickups had been used all day—an impossibility for one man. The report was contradicted further by the other contemporaneous documents the government itself introduced—the Daily Job Reports for May 24, 25, 26, and 27, all of which showed all three Barkers worked on Sunday. There was one document, that of May 27, 1986 containing a mark that could have been read as either a dash or amper-

sand. If it was an ampersand, it was contradicted by the rest of the document which stated that all three Barkers had worked on all three days. No other evidence was offered. Rowe, the government's only witness, explicitly conceded that he had no way of knowing whether the Barkers worked or not.

The jury, the judge, and we on appeal are in exactly the same situation as Rowe. We do not and cannot know whether the Barkers worked on Sunday, May 25, 1986. A self-contradictory report, contradicted on the vital point by all the other contemporary reports, proves nothing. There is not merely a reasonable doubt as to Barker's guilt; there is total uncertainty as to what in fact is the truth, and that conclusion is reached from the government's evidence, drawing all inferences that might be drawn in the government's favor.

The jury itself gave contradictory responses to the count that presented this issue. The jury was unable to agree on count 33a which charged Barker with overcharging for two three-quarter ton pickups, each used 8 hours on Sunday, May 25, 1986. The jury convicted Barker of count 33b for billing 3 men, instead of 1, on the same date. How did one man use 2 pick-up trucks all day? To have been in doubt on the pick-ups, the jury had to be in the dark as to the men.

The same conclusion must be reached as to the doublebilling of overhead. The one document on which Rowe relied shows the allocation of part of Barker's salary to direct charges distinct from the indirect charges constituting overhead. The document undermines the hearsay report that all of Barker's wages were in overhead. Even putting aside Traillee's actual testimony distinguishing G & A and job site overhead, the document itself is entirely ambiguous. It does not show what Rowe once thought it did show, that any wages claimed by Barker must have been doublebilled because he always was paid through overhead.

Rowe had no basis as an expert for analyzing overhead. Rowe spoke gobbledygook when he did testify about overhead.

Rowe did not know what Lionsgate billed for overhead. The jury and judge could not have known, nor can we. A man cannot rationally be convicted of claiming wages for which he was already paid when no one can say whether or not he had been already paid.

It was not the trial court's duty to say whether there was "a miscarriage of justice" (a rhetorical term whose metaphorical force may exaggerate what must be found in order to set aside the verdict). The court's duty was to determine whether the evidence was "sufficient to sustain a conviction." Federal Rules of Criminal Procedure 29. If it was not sufficient, the court had no choice but to annul the verdict. A "mere modicum" of evidence making the existence of each element of the crime more probable than not was not the kind of evidence that could sustain a conviction. *Jackson v. Virginia*, 443 U.S. at 320, 99 S.Ct. at 2789. Where the evidence did not establish guilt beyond a reasonable doubt the defendant was entitled to acquittal. *Id.*

*The Evidence of Intent.* The evidence of intent is, if possible, even less than the evidence of inaccuracy. To be false, a claim must not only be inaccurate but consciously so. As the judge charged the jury, Barker must have had the specific intent to file a claim he knew to be false. The verdict implies that the jury found he had such intent. But there is zero evidence to support the jury's findings.

Rowe knew nothing of Barker's intent. Shy believed he wanted to get $5 million out of the contract—no evidence at all of an intent to falsifying a few thousand dollars worth of claims. Apart from Shy, not a scintilla of evidence on intent was offered.

The government may have assumed that it could prove such a pattern of unjustified charges that an intent to falsify might be inferred from their number. *See United States v. National Wholesalers*, 236 F.2d at 950. Whatever the government's hope in this regard, when it failed to prove over 99% of its dollar claims and when the trial judge ordered a judgment of acquittal on the counts "that we are really here for," no inference was warranted as to the intent

governing the three alleged inaccuracies. On over $760,000 of claims that the government said were false and on over an additional $1.6 million that the government did not even challenge, Barker appears to have been entirely honest. Without concrete proof no reasonable trier of fact could find that on some $6,000 worth of claims he had an intention of falsifying.

It is hard to believe but it must be the government's theory that if a contractor submits supporting data for a claim, and that supporting data is not accurate, then the claim is criminally false—that the very existence of inaccuracy establishes the knowledge and therefore the intent to falsify the claim. If this is the government's theory, it is not the law.

We are not dealing here with a regulatory statute that imposes absolute liability regardless of intent. We are dealing with ordinary criminal law where the ordinary common law rule applies: intent is part of the crime and intent must be proved. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *United States v. National Wholesalers*, 236 F.2d at 950.

A moment's reflection will suggest what the government's theory would mean for the practice of law. Every lawsuit against the United States ends in a written assertion or demand for payment of a certain sum of money by the United States. If inaccuracy in any statement forming part of the complaint constitutes the filing of a false claim, a great many lawyers will be subject to prosecution under 18 U.S.C. § 287. The supposition is a *reductio ad absurdum*. If some lawyers and judges think Fed.R.Civ.P. 11 is too severe, what would any lawyer or judge think of criminalizing federal civil practice under the Federal False Claims Act? But there is no way of distinguishing what the government has done here and what, if it is right, it could do to any lawyer that aroused its indignation by inaccuracy in a suit in tort

or what the government could do to any appointed defense counsel in a criminal case who carelessly misstated the hours he had worked. On the government's theory, successfully prosecuted to a jury verdict here, the statement of support for a demand for money that is not factually accurate must be consciously false. Intent is proved by the asking of the claim. And in the expansive reading of "claim" by the government the inaccuracy in supporting data is criminal.

There is no need to address Barker's appeal to the First Amendment. It is plain that his conviction cannot stand. This sad case must be brought to an end. The Corps has, perhaps, made a point dear to bureaucracy: You don't fight City Hall. It is not for the federal courts to impose a criminal penalty on Barker for being a person who did not go along with the Corps.